## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

UNITED STATES OF AMERICA,

       Plaintiff,

    v.

JUSTIN ACEVEDO,

      Defendant.

No. 18 CR 509-2

Judge Robert W. Gettleman

## DEFENDANT'S SENTENCING MEMORANDUM

Justin Acevedo, through his undersigned counsel, submits his Sentencing Memorandum and objections to the PSR.

Based on the facts of this case, the sentencing guidelines, and Mr. Acevedo's personal characteristics, defense counsel requests that the Court impose a sentence of 30 months in the custody of the Bureau of Prisons, followed by 12 months of home detention and three years mandatory supervised release.

## I. Objections to the PSR

Mr. Acevedo objects to two enhancements applied in the PSR: the four-point enhancement under §2K2.1(b)(1)(B) for an offense involving 8 to 24 firearms, and the four-point enhancement under §2K2.1(b)(5) for engaging in the trafficking of firearms. He also objects to the application of five criminal history points: three points related to his 2006 possession of a controlled substance, and two points related to the 2009 driving on suspended or revoked license. Finally, he objects to part of Discretionary Condition of Supervised Release 16.

### A.    8 to 24 firearms enhancement

The government asks this Court to apply a four-level enhancement under §2K2.1(b)(1)(B) for an offense involving 8 to 24 firearms, alleging that Mr. Acevedo is accountable for fourteen firearms, which are listed on pages 9-10 of its sentencing memorandum. The government contends that these firearms are relevant conduct to the offense of conviction, which is possession of a firearm by a felon.

The problem with the government's position, however, is that the government has not provided substantial independent evidence that Firearms 1 and 5-13 existed, much less that Mr. Acevedo possessed them. At most, the government has evidence that Mr. Acevedo engages in sales talk or puffery when discussing firearms with the CS and UCs in their recorded conversations.

Under the "corroboration" rule, "A defendant's uncorroborated confession, standing alone, is insufficient to support a conviction." *United States v. Brooks*, 513 F. App'x 612, 614 (7th Cir. 2013). The corroboration rule requires that "the government must provide substantial independent evidence which would tend to establish the trustworthiness of the statement." *Id.* (cleaned up). While the standard for applying a sentencing enhancement is lower than the standard for conviction at trial, the Government must still provide *some* evidence to corroborate a statement before an enhancement may be applied.

Here, the Government has not pointed to any such evidence for any of the alleged firearms that it argues support the enhancement:

- In January 2018, defendant offered to sell a CS a Taurus Judge revolver. There is no independent evidence that this firearm existed.

- On January 25, 2018 and February 1, 2018, defendant offered to sell a .38 caliber Smith & Wesson revolver for $400, stating that he could have it ready in an hour. There is no independent evidence that this firearm existed.

- On January 25, 2018 and February 1, 2018, defendant offered to sell a .45 caliber 1911 pistol. There is no independent evidence that this firearm existed.

- On January 25, 2018, defendant showed the CS a picture of a two-shot Derringer 9mm, stating that the firearm was for sale. On February 15, 2018, defendant told the agents that he recently sold the two-shot Derringer 9mm, for $250. There is no independent evidence that this firearm existed. The photo does not corroborate Mr. Acevedo's possession of this firearm, as he could have easily obtained a photo from the internet.

- On February 15, 2018, defendant told the agents that he had recently sold four Draco firearms for $1,000 each. There is no independent evidence that these firearms existed.

- On February 15, 2018, defendant stated that he had possession of a chrome Smith & Wesson .357 revolver with a rubber grip that was not for sale. When Mr. Acevedo was arrested in September 2018, agents did not recover at .357 revolver from his home. There is no independent evidence that this firearm existed.

- On February 15, 2018, defendant told the agents that he had recently sold a .410 Governor firearm for $750 and showed them a picture of a firearm.

3

There is no independent evidence that this firearm existed. The photo does not corroborate Mr. Acevedo's possession of this firearm, as he could have easily obtained a photo from the internet.

Even if some of these firearms existed, it appears that the government is counting the same firearm multiple times. In January 2018, Mr. Acevedo claimed to have a .410 Taurus Judge revolver for sale. Later, in February 2018, Mr. Acevedo told the agents that he had recently sold a .410 Governor (a firearm also manufactured by Taurus). This appears to be the same firearm, discussed as puffery, to two different audiences – first to the CS, then later to the agents. Similarly, the .38 caliber Smith & Wesson revolver Mr. Acevedo discussed selling the CS for $400 on January 25 and February 1, 2018 may be the .38 caliber Arsmcor firearm sold to the agents on February 15, 2018 for $400, if it existed at all.

For those reasons, Mr. Acevedo should only be held accountable for a maximum of four firearms—the .38 caliber handgun sold on February 15, 2018, and the three firearms sold by Mr. Montes to the agents on January 25, 2018.

B.   Firearm trafficking enhancement

The government next argues that the four-level enhancement for trafficking in firearms applies. In support of their argument, the government points to statements made by Mr. Acevedo to the CS. But the CS was not the purchaser of the firearms. For this enhancement to apply, the government must show that Mr. Acevedo:

> (ii) knew or had reason to believe that such conduct would result in the transport, transfer, or disposal of a firearm to an individual —

> (I) whose possession or receipt of the firearm would be unlawful; or
>
> (II) who intended to use or dispose of the firearm unlawfully.

USSG §2K2.1(b)(5) n. 13

Mr. Acevedo's statements demonstrate that he knew or had reason to believe that the CS could not legally possess firearms, but the CS was not the person who possessed or received the firearms. For this enhancement to apply, the government must show that Mr. Acevedo had some knowledge or reason to believe that the undercover agents, in their cover identities (as the individuals who received the firearms), could not legally possess firearms. The government has presented no evidence that Mr. Acevedo had any knowledge about the agents' alleged motives or uses for the firearms that Mr. Montes sold them on January 25, 2018.

### C.  Criminal History Calculation

Mr. Acevedo objects to the three points assigned to case number 06CR14757 in paragraph 49 of the PSR, and two points assigned to case number 09TR2140 in paragraph 56.

Regarding case number 06CR14757, Mr. Acevedo was convicted of possession of a controlled substance. The substance he possessed was marijuana. On January 1, 2020, marijuana possession became legal in Illinois, and the state has begun the process of expunging thousands of prior convictions. Mr. Acevedo's case has not yet been expunged but, because it is no longer a valid conviction in Illinois, he should not receive 3 points toward his criminal history score for this case. *See* USSG § 4A1.2(j) ("Sentences for expunged convictions are not counted, but may be

considered under §4A1.3 (Departures Based on Inadequacy of Criminal History Category (Policy Statement))").

Regarding case number 09TR2140, while the ticket was issued in 2009, the case was not concluded until 2013. The sentence of one-year conditional discharge was entered on March 22, 2011—while Mr. Acevedo was in the custody of the Wisconsin Department of Corrections serving a three-and-a-half-year sentence, beginning on January 22, 2010. It appears from the publicly available record on McHenry County Clerk of Court's website that Mr. Acevedo was not present during any hearings after 2009 and had no opportunity to resolve this ticket.

### D.   Conditions of Supervised Release

Mr. Acevedo objects to Discretionary Condition of Supervised Release 16, specifically, the provision allowing a probation officer to visit him at work. He has no objection to visits at other locations; however, work visits may jeopardize his continued employment. Employers frequently terminate employees after a visit by a probation officer and view probation officer visits as disruptive to the workplace even if they are aware of the employee's prior conviction. This provision creates unnecessary conflict with condition number four, which requires that Mr. Acevedo seek and work conscientiously at lawful employment.

Based on the foregoing objections, it is the defense's position that Mr. Acevedo's sentencing guidelines should be offense level 23 and criminal history category II, resulting in a sentencing guideline range of 51 – 63 months.

## II.    Avoiding unwarranted sentencing disparities

Sentencing data for firearm offenses shows that a sentence of 37 months is the national median sentence for all firearm offenses under Guideline §2K2.1.[1]  For similarly situated defendants, that is, defendants sentenced under Guideline §2K2.1 in criminal history category II, the median sentence is 24 months.  The government has requested a statutory maximum sentence of 120 months, which is far outside of the normal range of sentences imposed for crimes of this nature.

Among the statutory factors that the Court is bound to consider in arriving at a sentence is "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct". 18 U.S.C. § 3553(a)(6).  In fiscal year 2019, there were 7,952 defendants sentenced under §2K2.1 as a primary guideline nationally.[2]  Within the Seventh Circuit, there were 501 defendants sentenced under §2K2.1 as a primary guideline[3], and within the Northern District of Illinois, there were 119 defendants sentenced under §2K2.1  as a primary guideline.[4]

---

[1] All statistics discussed in this section can be found at the U.S. Sentencing Commission's website, using the Interactive Data Analyzer tool. https://ida.ussc.gov/analytics/saw.dll?Dashboard
[2] The figure includes the 7,952 cases reported to the Commission. Cases missing information necessary to complete the analysis were excluded from this figure. Sentences of 470 months or greater (including life) and probation were included in the sentence average computations as 470 months and zero months, respectively. Sentences of probation only are included here as zero months. The information in this figure includes conditions of confinement as described in USSG §5C1.1.
[3] The figure includes the 501 cases reported to the Commission. Cases missing information necessary to complete the analysis were excluded from this figure. Sentences of 470 months or greater (including life) and probation were included in the sentence average computations as 470 months and zero months, respectively. Sentences of probation only are included here as zero months. The information in this figure includes conditions of confinement as described in USSG §5C1.1.
[4] The figure includes the 119 cases reported to the Commission. Cases missing information necessary to complete the analysis were excluded from this figure. Sentences of 470 months or greater (including life) and probation were included in the sentence average computations as 470 months

Nationally and within the Seventh Circuit, the median sentence was 37 months, substantially below the statutory maximum in this case. Importantly, this statistic covers defendants in all six criminal history categories.

Within the Northern District of Illinois, defendants received a median sentence of 39 months, which is only slightly higher than the national and Seventh Circuit median, and 33% of the statutory maximum of 120 months.

When these sentencing trends are broken down by criminal history category, the data continues to support a sentence well below the statutory maximum to avoid unwarranted sentencing disparities. Nationally, defendants sentenced for firearms offenses in fiscal year 2019 with a criminal history category II, received a median sentence of 24 months,[5] while in the Seventh Circuit defendants sentenced for firearms offenses in fiscal year 2019 with a criminal history category II received median sentences of 27 months.[6]

The Northern District of Illinois was an outlier in fiscal year 2019 – defendants sentenced for firearms offenses in fiscal year 2019 with a criminal history category

---

and zero months, respectively. Sentences of probation only are included here as zero months. The information in this figure includes conditions of confinement as described in USSG §5C1.1.

[5] The figure includes the 753 cases reported to the Commission. Cases missing information necessary to complete the analysis were excluded from this figure. Sentences of 470 months or greater (including life) and probation were included in the sentence average computations as 470 months and zero months, respectively. Sentences of probation only are included here as zero months. The information in this figure includes conditions of confinement as described in USSG §5C1.1.

[6] The figure includes the 53 cases reported to the Commission. Cases missing information necessary to complete the analysis were excluded from this figure. Sentences of 470 months or greater (including life) and probation were included in the sentence average computations as 470 months and zero months, respectively. Sentences of probation only are included here as zero months. The information in this figure includes conditions of confinement as described in USSG §5C1.1.

II received a median sentence of 41 months.[7]  When analyzed further, however, the data for the Northern District of Illinois shows that a little more than one-third of these defendants received a sentence of zero to 24 months imprisonment, another one-third received a sentence of 24 to 59 months imprisonment, and <u>only 9.1%</u> received a sentence of 120 months or more:



---

Even if the Court finds that Mr. Acevedo falls into criminal history category IV, the national[8], Seventh Circuit[9] and Northern District of Illinois median sentences are 43 months, 38 months, and 36 months, respectively. The highest median sentence, 43 months, is 36% of the 120-month statutory maximum sentence that the government is seeking, with <u>zero</u> defendants receiving a sentence of 120 months or more.



**Distribution of Sentence Length**
Fiscal Year 2019

---

[8] The figure includes the 1,492 cases reported to the Commission. Cases missing information necessary to complete the analysis were excluded from this figure. Sentences of 470 months or greater (including life) and probation were included in the sentence average computations as 470 months and zero months, respectively. Sentences of probation only are included here as zero months. The information in this figure includes conditions of confinement as described in USSG §5C1.1.
[9] The figure includes the 99 cases reported to the Commission. Cases missing information necessary to complete the analysis were excluded from this figure. Sentences of 470 months or greater (including life) and probation were included in the sentence average computations as 470 months and zero months, respectively. Sentences of probation only are included here as zero months. The information in this figure includes conditions of confinement as described in USSG §5C1.1.

Even within the context of this case, a sentence of 120 months creates a massive sentencing disparity. Mr. Acevedo's co-defendants, Kevin Delaney and Tirso Montes, received sentences well below the 120-month maximum, even though Mr. Montes pled guilty to far more serious charges in front of Judge Kennelly.

Mr. Delaney plead guilty to count two of the indictment, the same charge to which Mr. Acevedo pled guilty, and received a sentence of 24 months incarceration followed by three years of supervised release. It is the defense position that Mr. Acevedo's criminal history score is the same as Mr. Delaney's. Even if Mr. Acevedo's criminal history score is higher than Mr. Delaney's, Mr. Acevedo's criminal history is also overstated. Of the 24 convictions listed in the PSR, 14 are related to minor driving offenses, such as driving on a suspended license or operating an uninsured motor vehicle. Mr. Acevedo was also convicted of possession of cannabis in 2003 and possession of a controlled substance, marijuana—conduct which is no longer illegal in the state of Illinois.

More interesting is Mr. Montes. Mr. Montes was charged with conspiracy to kidnap, kidnapping, conspiracy to make extortionate calls, transmission of extortionate calls over interstate wires and possession of a firearm by a convicted felon in case number 18 CR 465. He pled guilty to transmission of extortionate calls over interstate wires (count four) and received a sentence of 69 months incarceration followed by three years supervised release.[10] The factual basis

---

[10] Judgment in case number 18 CR 465, attached as Exhibit A.

contained in Mr. Montes' plea agreement and the government's sentencing memo[11] lay out a harrowing chain of events, where Mr. Montes and his co-conspirators made multiple extortionate demands for money and cocaine to Individual A's uncle, after claiming to have kidnapped Individual A. In exchange for his guilty plea in case number 18 CR 465, the government agreed to dismiss the charges in this case, and instead use the January 25, 2018 firearm sale detailed in count one of this indictment as relevant conduct for purposes of calculating his sentence in that case.

Mr. Montes also has a far more serious and violent criminal history than Mr. Acevedo, including a conviction for attempted murder of a police officer in 2004. He also has multiple arrests for violent offenses like domestic battery, and he has several burglary convictions. Yet despite a similar criminal history and guideline range, Mr. Montes was sentenced to a little more than half the sentence the government is seeking for Mr. Acevedo. A sentence of 120 months imprisonment would create a serious sentencing disparity between co-defendants in the same case.

## III.  History and characteristics of the defendant

Justin was born and raised in the Chicago area. His early years were filled with abandonment, abuse, and addiction. As a young boy, he was primarily raised by his grandmother, but he was bounced back and forth between her home and his mother's home. His father left after his parents divorced when he was a toddler. His father suffered from serious mental health problems, including bipolar disorder and paranoid schizophrenia, which led to a severe drug addiction. His mother

---

[11] Plea Agreement and Government's Sentencing Memorandum in case number 18 CR 465, attached as Exhibit B.

abandoned Justin at a family birthday party shortly thereafter, which led to him living with his grandmother. Stints living with his mother never lasted long due to her own drug addiction, and she was neglectful when Justin lived with her. He loved his grandmother and was well cared for when he lived with her.

Growing up, he struggled in school and was enrolled in special education classes. He was diagnosed with ADHD at eight and was prescribed medication. His medication helped for a while but lost its efficacy in his pre-teen years. He joined the Insane Deuces gang when he was only 10 years old and began using alcohol and marijuana with older kids. He joined because the gang offered the stability he was lacking at home and he wanted to be part of something. The gang offered him the structure and sense of belonging he missed because his parents had abandoned him. He started using cocaine at 11, which continued off and on until he was 28.

Adding to the lack of stability in his early life, Justin's grandmother died when he was 12. He moved in with his aunt, Cindy Gillman, in Las Vegas after his grandmother's death. He enjoyed living with Cindy but had entered his early teen years by the time he moved to Las Vegas, and, coupled with his insecure early years and learning disability, he became rebellious. Eventually, he moved back to Illinois, living with his mother and abusive stepfather, Rene Anaya, for a short period. Mr. Anaya physically abused Justin and often forced him to sleep outdoors in the winter. Justin took shelter at friends' houses when he could but became functionally homeless at 15.

13

Homelessness pushed Justin deeper into gang life and drug abuse. He used drugs to cope with his struggles and participated in gang activity because they were the only people in Chicago who consistently supported him after his grandmother's death. Aunt Cindy was too far away to provide the support and structure that he needed. Justin dropped out of Woodstock High School in the 11th grade due to his inability to concentrate on his schoolwork. His ADHD was unmedicated at that point, and he lacked access to healthcare and a stable home. He later completed his GED while in the Illinois Department of Corrections in 2006. Justin was further traumatized when he found his uncle dead after a drug overdose. This affected him profoundly. Justin is reluctant to use medications after this event because his uncle overdosed on prescription medication.

Justin has seven children: five biological children, and two stepchildren with his wife, Maryanne. Justin is a very involved father and provides both emotional and financial support for all his children, though his child support is in arrears to Ms. Otto for his three oldest children. He was diligently working toward paying down that child support obligation when he was arrested in this case. His oldest son, Julian, began experiencing health problems after Justin was arrested in this case, which are caused by an extra chromosome he inherited from Justin. Julian is currently living with Justin's aunt Cindy in Florida, while Destiny and Mariah live with their mother. Justin and Maryanne share one son, and he co-parents her older two children from a previous relationship.

Though Justin's relationship with Maryanne has been rocky, they maintain open lines of communication and are pursuing reconciliation once Justin is released. His pretrial detention exacerbated the strain on their relationship, which led Maryanne to file for divorce. Prior to the lock down at MCC, Maryanne visited him and spoke to him on the phone frequently. Recently, their relationship has been on the mend, and the divorce petition may be dismissed once Justin is released. Justin intends to work toward reconciliation and would love to mend their relationship going forward. He feels that Maryanne is a positive influence in his life, and he believes that even if they can't reconcile, she will continue to be supportive of his efforts to move forward and they will continue to successfully co-parent their children.

Justin has not had contact with Elijah, his middle son, due to parental interference in their relationship by Elijah's mother, Athena. Athena is Native American, and she took Elijah to a reservation to prevent Justin from enforcing his custody and visitation rights. Justin was unable to pursue relief in family court because the Minnesota court lacked jurisdiction to enforce orders on tribal land. In April 2020, Elijah was taken into foster care in Minnesota. Justin was notified that Elijah had been found, and he would like to reclaim him from the foster care system as soon as possible. He has been in contact with Elijah's case worker for the last few months and has begun making plans to pursue full custody once he is released.

Justin suffered a traumatic brain injury after being shot in the head, which triggered a seizure disorder. He was evaluated by Dr. Michael Gelbort[12] in December 2019. Dr. Gelbort reports significant permanent effects of this brain injury but notes that there are programs that can help Justin adapt his thinking and overcome these weaknesses, such as neurocognitive therapy. The Brain Injury Association of Illinois[13] and the Brain Injury Association of America[14] can provide Justin with access to programs that will help him manage his symptoms and teach him new skills to compensate for his brain injury.

Moreover, when Justin fills his life with positive influences, such as Maryanne, he is better equipped to make good choices. Now that he is aware of the effects of his brain injury, Justin will be better able and more incentivized to avoid people who would lead him into illegal activity in the future. The diagnosis and explanation of the effects of his brain injury have given Justin an invaluable tool to avoid contact with the criminal-justice system in the future. Previously, he struggled with decision making but did not understand why. Now that he understands why some things are more difficult for him, he can take active steps to make better decisions in the future.

Justin also needs continued mental-health treatment. He was diagnosed with bipolar disorder and paranoid schizophrenia as an adult. He received therapy while in IDOC custody, but had trouble accessing appropriate care after his release

---

[12] Dr. Gelbort's report will be filed under seal as Exhibit C and provided to the government separately.
[13] https://www.biail.com/index.htm
[14] https://www.biausa.org/

due to a lack of health insurance. He would like to continue therapy and noted that he greatly benefitted from the therapy he received.

Finally, Justin has a consistent work history and employable job skills. His previous employers, New City Moving and USA Board-up and Glass are both willing to rehire him when he is released. He has skills and experience in construction and moving, which should make him employable in short order.

Justin's plans are to work, financially support his family and continue to be involved in his children's lives. He hopes to get full custody of Elijah so that he can rebuild their relationship. He wants to begin neurocognitive therapy and resume psychological therapy to further develop his coping skills.

## IV.    COVID-19

As the court is aware, the world has changed drastically since the beginning of 2020, due to the novel coronavirus pandemic. This cannot be ignored when fashioning Mr. Acevedo's sentence.

### A.    Conditions of Confinement and Spread of Coronavirus

Conditions of pretrial confinement create the ideal environment for the transmission of contagious diseases.[15] Inmates cycle in and out of BOP pretrial facilities from all over the world and the country, and people who work in the facilities leave and return daily. According to public health experts, incarcerated individuals "are at special risk of infection, given their living situations," and "may

---

[15] Joseph A. Bick (2007). Infection Control in Jails and Prisons. *Clinical Infectious Diseases* 45(8):1047-1055, *at* https://doi.org/10.1086/521910.

also be less able to participate in proactive measures to keep themselves safe;" "infection control is challenging in these settings."[16]  Outbreaks of the flu regularly occur in jails, and during the H1N1 epidemic in 2009, many jails and prisons dealt with high numbers of cases.[17]  Recent outbreaks of mumps in facilities in Texas and New Jersey have demonstrated how quickly institutions can be overrun with disease, especially when the viruses have long incubation times, because inmates and guards cannot maintain sufficient space to practice social distancing, and may have contact with high numbers of other people in the facilities.[18]

Ohio presents an enlightening demonstration in transmission of contagious diseases in correctional settings.  Ohio's governor issued a stay-at-home order on March 22, 2020.  As of April 19, 2020, the state recorded 11,602 cases state-wide, with almost 2,500 cases of COVID-19 in the inmate populations housed in its correctional institutions.  This number represents 21% of all the cases reported in the state.  Marion Correctional Institution alone has 1,828 infected inmates – **73% of the prison's population**.[19]

---

[16] "Achieving A Fair And Effective COVID-19 Response: An Open Letter to Vice-President Mike Pence, and Other Federal, State, and Local Leaders from Public Health and Legal Experts in the United States," (March 2, 2020), *at* https://bit.ly/2W9V6oS.

[17] *Prisons and Jails are Vulnerable to COVID-19 Outbreaks*, The Verge (Mar. 7, 2020) *at* https://bit.ly/2TNcNZY; *Health Care Behind Bars Is Already Abysmal. Are Prison Officials Prepared for the Coronavirus?,* Mother Jones (March 4, 2020) https://www.motherjones.com/crime-justice/2020/03/health-care-behind-bars-is-already-abysmal-are-prison-officials-prepared-for-the-coronavirus/

[18] *300 inmates in Texas' Harris County jail are quarantined over a mumps outbreak*, CNN Health (June 13, 2019) https://www.cnn.com/2019/06/13/health/mumps-texas-harris-county-jail/index.html; *6 inmates at a New Jersey jail came down with the mumps. The entire facility is now quarantined*, CNN Health, (June 13, 2019) https://www.cnn.com/2019/06/12/us/mumps-jersey-bergen-county-jail-trnd/index.html

[19] Patrick Cooley, The Columbus Dispatch, Coronavirus in Ohio: More than 1,800 Inmates at Marion Correctional Test Positive (April 19, 2020), available at:

Similarly, Rikers Island in New York City is in the midst of a massive outbreak of COVID-19. On March 30, 2020, the jail's top doctor called the unfolding outbreak a "public health disaster" – a statement which turned out to be prophetic, as the jail went from one COVID-19 case to 180 in just twelve days.[20] Closer to home, the Cook County Jail faced an epidemic of COVID-19 cases, with over 1,000 positive results and at least four deaths, despite having a record low number of detainees in its custody.[21] "Despite warnings from health officials and attempts to release some inmates to avoid outbreaks, jails, prisons, and detention centers across the country have emerged as major coronavirus spreaders. As of June 11, 2020, eight of the 10 largest-known sources of infection in the United States were correctional facilities, according to [New York] Times tracking data."[22] Updated data as of July 24, 2020 all of the 10 largest-known sources of infection in the United States are correctional facilities.[23]

---

https://www.dispatch.com/news/20200419/coronavirus-in-ohio-more-than-1800-inmates-at-marion-correctional-test-positive

[20] Miranda Bryant, The Guardian, Coronavirus spread at Rikers is a 'public health disaster', says jail's top doctor (April 1, 2020) available at: https://www.theguardian.com/us-news/2020/apr/01/rikers-island-jail-coronavirus-public-health-disaster

[21] Cheryl Corley, NPR, The COVID-19 Struggle in Chicago's Cook County Jail (April 13, 2020) available at: https://www.npr.org/2020/04/13/833440047/the-covid-19-struggle-in-chicagos-cook-county-jail

[22] The New York Times, Coronavirus Live Updates: Ohio Prison Is a Major Infection Hot Spot (April 20, 2020) available at: https://www.nytimes.com/2020/04/20/us/coronavirus-live-news.html?searchResultPosition=2&login=email&auth=login-email#link-4ced1d

[23] The New York Times, Coronavirus in the U.S.: Latest Map and Case Count (July 24, 2020) available at: https://www.nytimes.com/interactive/2020/us/coronavirus-us-cases.html

| CASES CONNECTED TO | ▼ CASES |
|---|---|
| Marion Correctional Institution — Marion, Ohio | 2,440 |
| San Quentin State Prison — San Quentin, Calif. | 2,350 |
| Pickaway Correctional Institution — Scioto Township, Ohio | 1,794 |
| Harris County jail — Houston, Texas | 1,723 |
| Trousdale Turner Correctional Center — Hartsville, Tenn. | 1,382 |
| North County jail — Castaic, Calif. | 1,376 |
| Ouachita River Unit prison — Malvern, Ark. | 1,276 |
| Avenal State Prison — Avenal, Calif. | 1,156 |
| California Institution for Men — Chino, Calif. | 1,134 |
| Cummins Unit prison — Grady, Ark. | 1,131 |
| Show all | |

Early trends of mass infections in prisons and jails continue to hold true in both state and federal facilities. At FMC Carswell in Fort Worth, Texas, 40% of the inmates have tested positive for COVID-19, as of July 21, 2020, while FCI Seagoville, near Dallas, has a 63% positive rate.[24]

Transfers between correctional facilities present a particular danger. In California, inmates transferred from the California Institute for Men in Chino spread COVID-19 to facilities that reported no infections, like San Quentin and Corcoran State Prison. These transfers led to massive outbreaks and preventable

---

[24] Kay Jones, Jamiel Lynch and Nicole Chavez, CNN, NSA leaker Reality Winner among 500 women with coronavirus at Texas federal prison (July 21, 2020), available at: https://www.cnn.com/2020/07/21/us/reality-winner-texas-medical-prison-coronavirus/index.html

deaths – Corcoran reports ten COVID-19 cases and one death, while San Quentin has over 2,000 cases, including 868 active infections and 15 deaths among its 3,362 inmates.[25, 26]

## B.   Bureau of Prisons and MCC

COVID-19 cases have exploded within the Bureau of Prisons. As of July 23, 2020, 10,029 inmates and 1,045 staff members within the BOP have tested positive for the disease, and 99 inmates and one staff member have died.[27, 28] Over the last four months, and in spite of various precautionary measures the BOP has undertaken, the number of positive cases has risen by a jaw dropping 344,200%.[29]

Corey Trammel, a union representative for correctional officers at FCI Oakdale commented, "It's been simultaneous, just people getting sick back to back to back to back. We don't know how to protect ourselves. Staff are working 36-hour shifts — there's no way we can keep going on like this."[30]  COVID-19 has also

---

[25] Kim Christensen and Richard Winton, Los Angeles Times, Inmates talk of COVID fear and helplessness after transfers bring 'the beast' to San Quentin (July 22, 2020) available at: https://www.latimes.com/california/story/2020-07-22/coronavirus-prisons-transfers-covid-deaths-inmates

[26] Harmeet Kaur and Stella Chan, CNN, At least 15 prisoners at a California prison have died of apparent complications from Covid-19 (July 23, 2020), available at: https://www.cnn.com/2020/07/23/us/california-san-quentin-coronavirus-inmates-trnd/index.html

[27] Bureau of Prisons, COVID-19 Resource Page, available at: https://www.bop.gov/coronavirus/ (updating regularly).

[28] Cassidy McDonald, CBS, Federal Prisons Confirm First Staff Death Linked to Coronavirus (April 18, 2020) available at: https://www.cbsnews.com/news/coronavirus-federal-prisons-confirm-first-staff-death-linked-to-covid-19-robin-grubbs-usp-atlanta/

[29] Objection to Time-Sensitive Supplemental Brief in Support of Compassionate Release, *United States v. Esparza*, No. 1:07-cr-294-BLW, Dkt. No. 121 (D. Idaho Mar. 24, 2020)(noting 3 BOP inmates and 3 staff members had tested positive for COVID-19)

[30] Kimberly Kindy, The Washington Post, An explosion of coronavirus cases cripples a federal prison in Louisiana (March 29, 2020), available at: https://www.washingtonpost.com/national/an-explosion-of-coronavirus-cases-cripples-a-federal-prison-in-louisiana/2020/03/29/75a465c0-71d5-11ea-85cb-8670579b863d_story.html (last checked June 10, 2020).

reached and spread within the Chicago MCC. As of July 23, 2020, the BOP has confirmed that 31 staff members and **144 inmates** have been infected with the disease, despite the "strict health and safety protocols" allegedly implemented by the MCC.

Mr. Acevedo contracted a skin infection due to poor sanitation at MCC in April and was hospitalized on April 10, 2020. While he was hospitalized, he reported COVID-19 symptoms and was tested. That test came back positive on April 13, 2020. On April 22, 2020, counsel was notified that Mr. Acevedo had been discharged from the hospital, however, he was readmitted to the hospital on May 1 with complications.[31] Mr. Acevedo appears to have contracted COVID-19 at MCC, despite wearing a mask and complying with the Bureau of Prisons "strict health and safety protocols".

While there is evidence to support short-term immunity to reinfection, we simply do not know whether this immunity will last. "At this early stage of understanding the new coronavirus, it is unclear where COVID-19 falls on the immunity spectrum. Although most people with SARS-CoV-2 seem to produce antibodies, we simply don't know yet what it takes to be effectively protected from this infection," says Dawn Bowdish, a professor of pathology and molecular medicine and Canada Research Chair in Aging and Immunity at McMaster University in Ontario."[32] "In summary, existing limited data on antibody responses to SARS-CoV-

---

[31] Counsel has requested medical records from Mr. Acevedo's second hospitalization, but has not yet received them.
[32] Stacey McKenna, Scientific American, What Immunity to COVID-19 Really Means (April 10, 2020) available at: https://www.scientificamerican.com/article/what-immunity-to-covid-19-really-means/

2 and related coronaviruses, as well as one small animal model study, suggest that recovery from COVID-19 might confer immunity against reinfection, at least temporarily. However, the immune response to COVID-19 is not yet fully understood and definitive data on postinfection immunity are lacking." [33] The risk of reinfection must be considered a real possibility until we can determine that those who have recovered from COVID-19 are, in fact, immune. Even if Mr. Acevedo is immune to COVID-19, his immune system has been weakened, increasing his chances of contracting other infections while he is vulnerable.

If Mr. Acevedo is given a lengthy sentence in Bureau of Prisons custody, he will be transferred to another facility. Mr. Acevedo would like to serve any remaining sentence at FCI Lexington to participate in the dual-diagnosis RDAP program for people with drug addictions and mental-health diagnoses. However, FCI Lexington is currently experiencing a serious COVID-19 outbreak, which puts Mr. Acevedo at high-risk if he is not immune.

## V. Deterrence does not require a lengthy sentence

Research has consistently shown that while the certainty of being caught and punished has a deterrent effect, "increases in severity of punishments do not yield significant (if any) marginal deterrent effects." Michael Tonry, *Purposes and Functions of Sentencing*, 34 CRIME & JUST. 1, 28 (2006). "Three National Academy of Science panels. . . reached that conclusion, as has every major survey of the

---

[33] Dr. Robert D. Kirkcaldy, Dr. Brian A. King and Dr. John T. Brooks, Journal of American Medical Association, COVID-19 and Postinfection Immunity (May 11, 2020) available at: https://jamanetwork.com/journals/jama/fullarticle/2766097

evidence." *Id.*; *see also* Zvi D. Gabbay, *Exploring the Limits of the Restorative Justice Paradigm: Restorative Justice and White Collar Crime*, 8 Cardozo J. Conflict Resol. 421, 447-48 (2007) ("[C]ertainty of punishment is empirically known to be a far better deterrent than its severity.").

Typical of the findings on general deterrence are those of the Institute of Criminology at Cambridge University. See Andrew von Hirsch et al., Criminal Deterrence and Sentence Severity: An Analysis of Recent Research (1999), *summary available at* http://members.lycos.co.uk/lawnet/SENTENCE.PDF. The report, commissioned by the British Home Office, examined penalties in the United States as well as several European countries. *Id.* at 1. It examined the effects of changes to both the certainty and severity of punishment. *Id.* While significant correlations were found between the certainty of punishment and crime rates, "the correlations between *sentence severity* and crime rates . . . were not sufficient to achieve statistical significance." *Id.* at 2 (emphasis added). The report concluded that the studies reviewed do not provide a basis for inferring that increasing the severity of sentences correspondingly increases deterrent effects. *Id.* at 1.

More recently, in May 2016, the U.S. Department of Justice's National Institute of Justice published a fact sheet entitled "Five Things About Deterrence", which summarized the research that has been done on deterrence. Three of the key findings include: (1) "[t]he *certainty* of being caught is a vastly more powerful deterrent than the punishment"; (2) "[s]ending an individual convicted of crime to prison isn't a very effective way of deterring crime; and (3) "[i]ncreasing the severity

of punishment does little to deter crime." *Id.*; *see also generally* Daniel S. Nagin, *Deterrence in the Twenty-First Century*, 42 CRIME & JUSTICE 199-263 (2013).

This conclusion is borne out in the U.S. Sentencing Commission's March 2016 report, *Recidivism Among Federal Offenders: A Comprehensive Overview*. Among the report's key findings is that "with the exception of very short sentences (less than 6 months), the rate of recidivism varies very little by length of prison sentence imposed (fluctuating between 50.8% for sentences between 6 months to 2 years, to a high of 55.5% for sentences between 5 to 9 years)." Importantly, a longer sentence of imprisonment makes a defendant *more* likely, not less likely, to reoffend. The study noted:

> Offenders with shorter lengths of imprisonment generally had lower recidivism rates. For instance, offenders with sentences of imprisonment of fewer than six months had the lowest rearrest rate at 37.5 percent, followed by offenders with sentences from six to 11 months (50.8 percent), and 12 to fewer than 24 months (50.8%). Conversely, the highest recidivism rates are generally found among offenders with longer sentences. Those with sentences from 60 months to fewer than 120 months had the highest rate (55.5%), followed closely by those with 24 to fewer than 60 months (54.0%), and 120 months or more (51.8%).[55]

*Id.* at 22. A sentence of 30 months in this case would adequately satisfy the goal of deterrence.

## VI. A fine is not appropriate

The guidelines note that the Court "shall impose a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine." USSG § 5E1.2(a). Mr. Acevedo has no present income and thus has no ability to pay a fine. His income once released is uncertain, and it is unlikely

that he will become able to pay a fine in the future. Consequently, the defense

requests that the Court decline to impose a fine.

Respectfully Submitted,

*s/Holly N. Blaine*
Attorney for Justin Acevedo

Holly N. Blaine (ARDC 6294873)
BLAINE & VANZANT, LLP
922 Davis Street
Evanston, Illinois 60201
Tel.: (312) 788-7584
Email: hnb@blainevanzant.com

## CERTIFICATE OF SERVICE

The undersigned attorney certifies that the foregoing document was filed and served on all counsel of record via the Court's ECF system.

*s/Holly N. Blaine*

# EXHIBIT A



# UNITED STATES DISTRICT COURT
Northern District of Illinois

| | |
|---|---|
| UNITED STATES OF AMERICA | ) **JUDGMENT IN A CRIMINAL CASE** |
| **v.** | ) |
| | ) |
| TIRSO MONTES | ) Case Number: 1:18-CR-00465(2) |
| | ) USM Number: 52196-424 |
| | ) |
| | ) |
| | ) Piyush Chandra |
| | ) Defendant's Attorney |

**THE DEFENDANT:**

☒ pleaded guilty to count Four (4) of the Indictment.

☐ pleaded nolo contendere to count(s) _____ which was accepted by the court.

☐ was found guilty on count(s) _____ after a plea of not guilty.

The defendant is adjudicated guilty of these offenses:

| **Title & Section / Nature of Offense** | **Offense Ended** | **Count** |
|---|---|---|
| 18:875A.F Interstate Communications - Ransoms | 01/25/2018 | 4 |

The defendant is sentenced as provided in pages 2 through 5 of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☐ The defendant has been found not guilty on count(s) _____

☒ All remaining counts are dismissed on the motion of the United States.

It is ordered that the defendant must notify the United States Attorney for this District within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant must notify the court and United States Attorney of material changes in economic circumstances.

August 12, 2019
Date of Imposition of Judgment

Signature of Judge
Matthew F. Kennelly, United States District Judge

Name and Title of Judge

8-14-2019
Date

ILND 245B (Rev. 04/19/2019 Judgment in a Criminal Case
Sheet 2 – Imprisonment

DEFENDANT: TIRSO MONTES
CASE NUMBER: 1:18-CR-00465(2)

# IMPRISONMENT

The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a total term of:
Sixty-nine (69) months as to count 4 of the Indictment.

☒     The court makes the following recommendations to the Bureau of Prisons: The defendant is to be placed in Oxford FCI or as close

      to Chicago as possible. The defendant is recommended to be placed in an institution with the RDAP program.

☒     The defendant is remanded to the custody of the United States Marshal.

☐     The defendant shall surrender to the United States Marshal for this district:

      ☐     at       on

    ☐     as notified by the United States Marshal.

    ☐     The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

      ☐     before 2:00 pm on

      ☐     as notified by the United States Marshal.

      ☐     as notified by the Probation or Pretrial Services Office.

# RETURN

I have executed this judgment as follows: _____

_____

_____

Defendant delivered on _____ to _____ at _____, with a certified copy of this
judgment.

_____
UNITED STATES MARSHAL

By   _____
     DEPUTY UNITED STATES MARSHAL

ILND 245B (Rev. 04/19/2019) Judgment in a Criminal Case
Sheet 6 – Schedule of Payments                                                                    Judgment – Page 3 of 5

DEFENDANT: TIRSO MONTES
CASE NUMBER: 1:18-CR-00465(2)

## MANDATORY CONDITIONS OF SUPERVISED RELEASE PURSUANT TO 18 U.S.C § 3583(d)

Upon release from imprisonment, you shall be on supervised release for a term of:
three (3) years.

You must report to the probation office in the district to which you are released within 72 hours of release from the custody of the Bureau of Prisons. The court imposes those conditions identified below:

**During the period of supervised release:**
1. The defendant shall not commit another Federal, State, or local crime.
2. The defendant shall not unlawfully possess a controlled substance.
3. The defendant shall cooperate in the collection of a DNA sample at the direction of the probation officer.
4. The defendant shall submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, not to exceed 104 tests in any one year.

## DISCRETIONARY CONDITIONS OF SUPERVISED RELEASE PURSUANT TO 18 U.S.C § 3563(b) AND 18 U.S.C § 3583(d)

**Discretionary Conditions** — The court orders that you abide by the following conditions during the term of supervised release because such conditions are reasonably related to the factors set forth in **§ 3553(a)(1)** and **(a)(2)(B), (C), and (D);** such conditions involve only such deprivations of liberty or property as are reasonably necessary for the purposes indicated in **§ 3553 (a)(2) (B), (C), and (D);** and such conditions are consistent with any pertinent policy statement issued by the Sentencing Commission pursuant to **28 U.S.C. 994a**.
The court imposes those conditions identified below:

**During the period of supervised release:**
1. The defendant shall not possess a firearm, ammunition, or a dangerous weapon.
2. The defendant shall report to the probation office in the federal judicial district to which the defendant is released within 72 hours of release from the custody of the Bureau of Prisons.
3. During the term of supervised release, the defendant shall report to the probation officer in a manner and frequency directed by the probation officer.
4. The defendant shall not knowingly leave the federal judicial district in which the defendant is being supervised without the permission of the court or probation officer. At the outset of the term of supervision, the probation office shall provide the defendant with a map of the judicial district.
5. The defendant shall permit a probation officer to visit the defendant at any reasonable time at home or any other reasonable location where the probation officer may legitimately enter, by right or consent. The defendant shall permit confiscation of any contraband observed in plain view of the probation officer.
6. The defendant shall answer truthfully any inquiries by the probation officer, subject to any constitutional or other applicable privilege.
7. The defendant shall notify the probation officer within 72 hours after becoming aware of any change or planned change in the defendant's employer, workplace, or residence.
8. The defendant shall notify the probation officer within 72 hours after being arrested, charged with a crime, or questioned by a law enforcement officer.
9. The defendant shall not knowingly meet, communicate, or otherwise interact with a person whom the defendant knows to be engaged, or planning to be engaged, in criminal activity and shall not knowingly meet, communicate, or otherwise interact with any of the following persons: Tirso Montes, Jorge Rosario, Angelo Quinones, Valerio Gomez, and any other person the defendant knows to be a member of a street gang.
10. The defendant shall not enter into any agreement to act as an informer or special agent of a law enforcement agency without the prior permission of the court.
11. The defendant shall refrain from any use of a controlled substance, as defined in section 102 of the Controlled Substances Act, 21 U.S.C. § 802, without a prescription from a licensed medical practitioner
12. The defendant shall participate in a mental health counseling and treatment program. The program shall be approved by the probation officer. The defendant shall abide by the rules and regulations of the program. The program may include testing, up to a maximum of 104 tests per year, to determine the defendant's compliance with the requirements of the program. The probation officer, in consultation with the treatment provider, shall supervise the defendant's participation in the program (provider, location, duration, intensity, etc.).

## SPECIAL CONDITIONS OF SUPERVISED RELEASE PURSUANT TO 18 U.S.C. 3563(b)(22) and 3583(d)
The court imposes those conditions identified below:

ILND 245B (Rev. 04/19/2019) Judgment in a Criminal Case
Sheet 6 – Schedule of Payments

DEFENDANT: TIRSO MONTES
CASE NUMBER: 1:18-CR-00465(2)

**During the term of supervised release:**
1. If the defendant is not gainfully employed, the defendant shall conscientiously seek lawful employment or pursue a course of study or vocational training that will equip him for employment.
2. If the defendant is not gainfully employed after the first 60 days of supervision, or for any 60 day period during the term of supervision, the defendant shall perform 10 hours of community service per week at the direction of the probation officer until he is gainfully employed at lawful employment. The total amount of community service shall not exceed 200 hours over the term of supervision.

# CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments on Sheet 6.

|  | Assessment | JVTA Assessment* | Fine | Restitution |
|---|---|---|---|---|
| **TOTALS** | $100.00 | $.00 | $.00 | $.00 |

☐ The determination of restitution is deferred until          . An *Amended Judgment in a Criminal Case (AO 245C)* will be entered after such determination.

☐ The defendant must make restitution (including community restitution) to the following payees in the amount listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below. However, pursuant to **18 U.S.C. § 3664(i)**, all nonfederal victims must be paid before the United States is paid.

☐ Restitution amount ordered pursuant to plea agreement $

☐ The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant **to 18 U.S.C. § 3612(f)**. All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to **18 U.S.C. § 3612(g)**.

☐ The court determined that the defendant does not have the ability to pay interest and it is ordered that:

☐ the interest requirement is waived for the          .

☐ the interest requirement for the          is modified as follows:

☐ The defendant's non-exempt assets, if any, are subject to immediate execution to satisfy any outstanding restitution or fine obligations.

\* Justice for Victims of Trafficking Act of 2015, Pub. L. No. 114-22.
\* Findings for the total amount of losses are required under **Chapters 109A, 110, 110A, and 113A of Title 18** for offenses committed on or after September 13, 1994, but before April 23, 1996.

ILND 245B (Rev. 04/19/2019) Judgment in a Criminal Case
Sheet 6 – Schedule of Payments

Judgment – Page 5 of 5

DEFENDANT: TIRSO MONTES
CASE NUMBER: 1:18-CR-00465(2)

# SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties is due as follows:

**A** ☒ Lump sum payment of $100.00 due immediately.

☐ balance due not later than     , or

☐ balance due in accordance with ☐ C, ☐ D, ☐ E, or ☐ F below; or

**B** ☐ Payment to begin immediately (may be combined with ☐ C, ☐ D, or ☐ F below); or

**C** ☐ Payment in equal      *(e.g. weekly, monthly, quarterly)* installments of $    over a period of    *(e.g., months or years)*, to commence    *(e.g.. 30 or 60 days)* after the date of this judgment; or

**D** ☐ Payment in equal      *(e.g. weekly, monthly, quarterly)* installments of $    over a period of    *(e.g., months or years)*, to commence    *(e.g.. 30 or 60 days)* after release from imprisonment to a term of supervision; or

**E** ☐ Payment during the term of supervised release will commence within    *(e.g. 30 or 60 days)* after release from imprisonment. The court will set the payment plan based on an assessment of the defendant's ability to pay at that time; or

**F** ☐ Special instructions regarding the payment of criminal monetary penalties:

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during imprisonment. All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the clerk of the court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

☐ Joint and Several

| Case Number<br>Defendant and Co-Defendant Names<br>(including defendant number) | Total Amount | Joint and Several<br>Amount | Corresponding Payee, if<br>Appropriate |
|---|---|---|---|

\*\*See above for Defendant and Co-Defendant Names and Case Numbers *(including defendant number)*, Total Amount, Joint and Several Amount, and corresponding payee, if appropriate.\*\*

☐ The defendant shall pay the cost of prosecution.

☐ The defendant shall pay the following court cost(s):

☐ The defendant shall forfeit the defendant's interest in the following property to the United States:

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) fine principal, (5) fine interest, (6) community restitution, (7) penalties, and (8) costs, including cost of prosecution and court cost

# EXHIBIT B




FILED

APR 18 2019

JUDGE MATTHEW F. KENNELLY
UNITED STATES DISTRICT COURT

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | No. 18 CR 465 |
| v. | |
| TIRSO MONTES | Judge Matthew F. Kennelly |

## PLEA AGREEMENT

1.     This Plea Agreement between the United States Attorney for the Northern District of Illinois, JOHN R. LAUSCH, JR., and defendant TIRSO MONTES, and his attorney, PIYUSH CHANDRA, is made pursuant to Rule 11 of the Federal Rules of Criminal Procedure and is governed in part by Rule 11(c)(1)(A), as more fully set forth below. The parties to this Agreement have agreed upon the following:

## Charges in This Case

2.     The indictment in this case charges defendant with conspiracy to kidnap, in violation of Title 18, United States Code, Section 1201(c) (Count One), kidnapping, in violation of Title 18, United States Code, Section 1201(a)(1) (Count Two), conspiracy to make extortionate calls, in violation of Title 18, United States Code, Section 371 (Count Three); transmission of extortionate calls over interstate wires, in violation of Title 18, United States Code, Section 875(a) (Counts Four through Six); and possession of a firearm by a convicted felon, in violation of Title 18, United States Code, Section 922(g)(1) (Count Seven).

3.    Defendant has read the charges against him contained in the indictment, and those charges have been fully explained to him by his attorney.

4.    Defendant fully understands the nature and elements of the crimes with which he has been charged.

### Charges to Which Defendant Is Pleading Guilty

5.    By this Plea Agreement, defendant agrees to enter a voluntary plea of guilty to Count Four of the indictment, which charges defendant with transmission of extortionate demands over interstate wires, in violation of Title 18, United States Code, Section 875(a).

### Factual Basis

6.    Defendant will plead guilty because he is in fact guilty of the charge contained in Count Four of the indictment. In pleading guilty, defendant admits the following facts and that those facts establish his guilt beyond a reasonable doubt and constitute relevant conduct pursuant to Guideline § 1B1.3:

On or about October 30, 2017, at approximately 12:32 p.m., at Chicago, in the Northern District of Illinois, Eastern Division, defendant did transmit, or cause to be transmitted, in interstate commerce, a communication, namely a telephone call placed from a cellular telephone operated on the interstate network of T-Mobile and which was routed from Chicago, Illinois, through an Akron, Ohio switch, containing a demand and request for a ransom and reward for the release of any kidnapped

person, namely Individual A, in violation of Title 18, United States Code, Sections 875(a) and 2.

Specifically, beginning on at least October 29, 2017, and continuing through October 30, 2017, defendant and co-defendants agreed to use and used cellular telephones to make multiple extortionate demands over interstate wires to Individual A's uncle, among others, demanding an amount in cash or cocaine or both for the release of Individual A, whom defendant and his co-conspirator claimed to have kidnapped. Defendant acknowledges that the government will argue at sentencing that defendants demanded $100,000 in cash or cocaine or both for the release of Individual A. At the time defendant and his co-defendants were making those extortionate demands, defendant possessed a firearm, namely a Glock 21 Gen 4 .45 caliber handgun, with serial number YUW134.

As part of the extortion, and with defendant's knowledge, at approximately 10:55 a.m., co-defendant A placed a call to Individual A's uncle, during which Individual A's uncle told co-defendant A that he could "only get 44Gs," meaning $44,000 for the release of Individual A. Co-defendant A responded, "that's all you got right now?" Individual A's uncle said that he could also get some cocaine. Consistent with defendant's agreement with his co-conspirators to extort Individual A's uncle, and with defendant's knowledge, co-defendant A said, "put the 44, and put the rest to work [meaning that defendant would accept the balance of the ransom by payment

of cocaine], and come on, come and get him [meaning Individual A]. I'm gonna call you in five minutes and tell you where to meet me at."

Throughout the day on October 30, 2017, defendant communicated with his co-defendants in person and by cellular telephone, to coordinate the extortion. Specifically, at 12:13 p.m., defendant sent a text message to co-defendant A asking "Wats taking so long." Co-defendant A responded, "D we waiting on him [which defendant understood meant Individual A's uncle] ima call him in 10 mins tell him were to meet me." Defendant responded that it was taking too long and that they needed to leave. Co-defendant A responded, "We is we good…"

As further part of the extortion, at 12:32 p.m., defendant and co-defendant C placed an extortionate call from co-defendant C's cellular telephone to Individual A's uncle, during which call defendant and co-defendant C told Individual A's uncle that they wanted money in exchange for Individual A's release. Defendant and co-defendant C made these statements in order to persuade Individual A's uncle to pay the ransom by causing Individual A's uncle to fear that defendant and his co-conspirators would seriously injure Individual A if the ransom was not paid. Defendant acknowledges that the government can prove that this call was transmitted from Chicago through an electronic switch located in Akron, Ohio.

As further part of the extortion, at approximately 1:28 p.m., defendant sent a text message to co-defendant A that said he was about to let Individual A go. Co-defendant A responded, "We aint do all this for nothing we gone get something." At

4

approximately 1:55 p.m., co-defendant A sent a text message to defendant that stated, "talked to buddy in Mexico he knw Wat it is, he said they gone pay."

As further part of the extortion, at approximately 6:14 p.m., defendant and his co-defendant A placed an extortionate telephone call from co-defendant C's cellular telephone to Individual A's uncle. During that telephone call, defendant and co-defendant A directed Individual A's uncle to meet at a certain location to exchange cash for Individual A's release and to "quit playing games," which meant to imply that if Individual A's uncle did not pay the cash that was requested, Individual A might be seriously injured.

At approximately 6:40 p.m., defendant and his co-defendants were found by law enforcement together with Individual A in a house on N. Meade Avenue in Chicago. Shortly before law enforcement arrived, the firearm that defendant had possessed throughout the day was discarded onto the roof of the house next door.

7.    Defendant, for purposes of computing his sentence under Guideline § 1B1.2, stipulates to having committed the following additional offense:

On or about January 25, 2018, at Chicago, in the Northern District of Illinois, Eastern Division, defendant previously having been convicted of a crime punishable by a term of imprisonment exceeding one year, did knowingly possess in and affecting interstate commerce a firearm, namely, a Savage Arms Inc., model Mark II, .22LR caliber bolt-action rifle, bearing serial number 2308370; a Savage Arms Inc., model 12, .308 Winchester caliber bolt-action rifle, bearing serial number H027849; and a

Sturm, Ruger and Co., model 10/22, .22 LR caliber semiautomatic rifle, bearing serial number 355-02090, which firearms had traveled in interstate and foreign commerce prior to the defendant's possession of the firearms, in violation of Title 18, United States Code, Section 922(g)(1).

More specifically, on or about January 25, 2018, defendant agreed to sell three rifles in his possession for $1300 to a customer of co-defendant E. Defendant understood that co-defendant E was brokering the sale to this customer. Unbeknownst to defendant and to co-defendant E, the customer was a confidential source ("CS") who was working with undercover law enforcement officers ("UCs"). Defendant agreed to meet with the CS and the UCs so they could inspect the rifles prior to the sale.

That same day, at approximately 4:38 p.m., defendant received a call from co-defendant E who told defendant that he had the money to purchase the firearms. During the course of subsequent calls, defendant and co-defendant E arranged to meet at a Home Depot parking lot, located at 1919 North Cicero Avenue, in Chicago, Illinois.

The same day, at approximately 5:54 p.m., co-defendant E and the CS arrived at the Home Depot parking lot and approached defendant. Defendant asked if the CS was police. Shortly afterwards, the UCs arrived, and defendant approached the UC vehicle and said that he wanted to move to a nearby Walmart parking lot.

6

That same day, at approximately 6:01 p.m., defendant, co-defendant E, the CS, and the UCs a drove from the Home Depot parking lot to a Walmart parking lot located at 4650 West North Avenue, in Chicago, Illinois. When they arrived, defendant, co-defendant E, the CS, and the UCs all exited their respective cars and walked to the rear of the UC vehicle. Defendant asked a UC, "y'all ain't the police, is y'all?" Defendant then retrieved two long gun cases from the back seat of defendant's Honda CRV and placed them in the back of the UC vehicle. Defendant knew that the following were in the gun cases: a Savage Arms, Mark II .22 caliber rifle bearing serial number 2308370; a Ruger, model 10/22, .22 caliber rifle bearing serial number 355-02090; a Savage Arms, model 12, 308 caliber rifle bearing serial number H927849; two black suppressors; one black Osprey 10-40x50 scope; a black trigger mechanism; and a .22 caliber extended magazine.

Defendant knew that co-defendant E then sold the UCs the rifles. Shortly afterwards, co-defendant E returned to defendant's car and gave him $1,300, which defendant understood to be his proceeds from the sale.

Defendant then retrieved several boxes of assorted ammunition, including approximately 1,500 .22 caliber rounds of Remington ammunition; approximately 400 .22 caliber rounds of Speer ammunition; and approximately 240 7.62 caliber rounds of ammunition from the rear backseat of the Honda CRV and placed the boxes of ammunition in the UC vehicle.

Defendant acknowledges that two of the firearms sold to the UCs in the January 25, 2018 sale were stolen: the Savage Arms, Mark II .22 caliber rifle bearing serial number 2308370 and the Savage Arms, model 12, 308 caliber rifle bearing serial number H927849.

Defendant knew that prior to his possession of the firearms on January 25, 2018, defendant had been convicted of a crime punishable by a term of imprisonment exceeding one year, as further described in Paragraph 10(c)(i) below. Defendant acknowledges that the firearms he possessed on January 25, 2018, were manufactured outside the State of Illinois, and therefore traveled in interstate commerce prior to his possession of them, and that each firearm was capable of accepting a large capacity magazine.

### Maximum Statutory Penalties

8.   Defendant understands that the charge to which he is pleading guilty carries the following statutory penalties:

a.   A maximum sentence of 20 years' imprisonment. This offense also carries a maximum fine of $250,000. Defendant further understands that the judge also may impose a term of supervised release of not more than three years.

b.   Pursuant to Title 18, United States Code, Section 3013, defendant will be assessed $100 on each count to which he has pled guilty, in addition to any other penalty imposed.

## Sentencing Guidelines Calculations

9.     Defendant understands that in determining a sentence, the Court is obligated to calculate the applicable Sentencing Guidelines range, and to consider that range, possible departures under the Sentencing Guidelines, and other sentencing factors under 18 U.S.C. § 3553(a), which include: (i) the nature and circumstances of the offense and the history and characteristics of the defendant; (ii) the need for the sentence imposed to reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense, afford adequate deterrence to criminal conduct, protect the public from further crimes of the defendant, and provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner; (iii) the kinds of sentences available; (iv) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (v) the need to provide restitution to any victim of the offense.

10.     For purposes of calculating the Sentencing Guidelines, the parties agree on the following points:

      a.     **Applicable Guidelines**. The Sentencing Guidelines to be considered in this case are those in effect at the time of sentencing. The following statements regarding the calculation of the Sentencing Guidelines are based on the Guidelines Manual currently in effect, namely the November 2018 Guidelines Manual.

9

b.   **Offense Level Calculations.**

**Count Four**

i.    The base offense level for Count Four is 18, pursuant to Guideline § 2B3.2.

ii.    Pursuant to Guideline § 2B3.2(b)(1), the offense level is increased by 2 levels because the offense involved an express or implied threat of death, bodily injury, or kidnapping.

iii.    The government's position is that, pursuant to Guideline § 2B3.2(b)(2), the offense level is increased by 2 levels, because the amount of ransom demanded exceeded $95,000. Defendant reserves the right to argue that this enhancement does not apply.

iv.    Pursuant to Guideline § 2B3.2(b)(3)(A)(iii), the offense level is increased by 5 levels because a firearm was possessed during the commission of the offense.

v.    The government's position is that the total offense level for Count Four is 27. Defendant's position is that the total offense level for Count Four is 25.

**Stipulated Offense**

vi.    The base offense level is 22, pursuant to Guideline § 2K2.1(a)(3) and Application Note 2(B), because the offense involved semiautomatic firearms that were capable of accepting a large capacity magazine, and because the

10

defendant committed the instant offense subsequent to sustaining a felony conviction for a crime of violence, namely the conviction described below in paragraph 10(c)(i).

vii.    Pursuant to Guideline § 2K2.1(b)(1)(B), the offense level is increased by 2 levels because the defendant's offense involved between three and seven firearms.

viii.    Pursuant to Guideline § 2K2.1(b)(4)(B), the offense level is increased 2 levels because firearms involved in the offense had been stolen.

ix.    The government's position is that, pursuant to Guideline § 2K2.1(b)(5), the offense level is increased 4 levels because the defendant was engaged in the trafficking of firearms. Defendant disagrees that this enhancement applies.

x.    The government's position is that the total offense level for the Stipulated Offense is 30. Defendant's position is that the total offense level for the Stipulated Offense is 26.

### Grouping

xi.    Pursuant to Guideline § 3D1.2, the offense of conviction and the stipulated offenses each constitute a separate group for purposes of determining the combined offense level.

xii.    Pursuant to Guideline § 3D1.4(a), the group consisting of the Stipulated Offense is counted as one unit because it has the highest offense level. Pursuant to Guideline § 3D1.4(b), the group consisting of Count Four is counted as

11

one additional unit because it is between one and four levels less serious than the group consisting of the Stipulated Offense.

        xiii.      Pursuant to Guideline § 3D1.4, because the total number of units is 2, the combined offense level is determined by adding 2 levels to the group with the highest offense level, which is the group formed by the Stipulated Offense. Therefore, the government's position is that the combined offense level for Count Four and the Stipulated Offenses is 32. Defendant's position is that the combined offense level for Count Four and the Stipulated Offense is 28.

### Acceptance of Responsibility

        xiv.      Defendant has clearly demonstrated a recognition and affirmative acceptance of personal responsibility for his criminal conduct. If the government does not receive additional evidence in conflict with this provision, and if defendant continues to accept responsibility for his actions within the meaning of Guideline § 3E1.1(a), including by furnishing the United States Attorney's Office and the Probation Office with all requested financial information relevant to his ability to satisfy any fine that may be imposed in this case, a two-level reduction in the offense level is appropriate.

        xv.      In accord with Guideline § 3E1.1(b), defendant has timely notified the government of his intention to enter a plea of guilty, thereby permitting the government to avoid preparing for trial and permitting the Court to allocate its resources efficiently. Therefore, as provided by Guideline § 3E1.1(b), if the Court

determines the offense level to be 16 or greater prior to determining that defendant is entitled to a two-level reduction for acceptance of responsibility, the government will move for an additional one-level reduction in the offense level.

      c.    **Criminal History Category**. With regard to determining defendant's criminal history points and criminal history category, based on the facts now known to the government and stipulated below, defendant's criminal history points equal 7 and defendant's criminal history category is IV:

      i.    On or about April 7, 2004, defendant was convicted of attempted first degree murder, in the Circuit Court of Cook County, Illinois, and sentenced to six years' imprisonment. Defendant receives three criminal history points for this conviction, pursuant to Guideline § 4A1.1(a).

      ii.    On or about April 10, 2014, defendant was convicted of possession of 2.5-10 grams of cannabis, in the Circuit Court of Cook County, Illinois, and sentenced to two days in jail. Defendant receives one criminal history point for this conviction, pursuant to Guideline § 4A1.1(c).

      iii.    On or about June 14, 2016, defendant was convicted of theft, in the Circuit Court of Cook County, Illinois, and sentenced to two years' probation. Defendant receives one criminal history point for this conviction, pursuant to Guideline § 4A1.1(c).

      iv.    Defendant receives an additional two criminal history points, pursuant to Guideline § 4A1.1(d), because defendant committed the instant

offense while under a criminal justice sentence, namely probation for the conviction set forth in paragraph 10(c)(iii).

    d.    **Anticipated Advisory Sentencing Guidelines Range**. Therefore, based on the facts now known to the government, the government's position is that the anticipated offense level is 29, which, when combined with the anticipated criminal history category of IV, results in an anticipated advisory sentencing guidelines range of 121 to 151 months' imprisonment, in addition to any supervised release and fine the Court may impose. Defendant's position is that the anticipated offense level is 25, which, when combined with the anticipated criminal history category of IV, results in an anticipated advisory sentencing guidelines range of 84 to 105 months' imprisonment, in addition to any supervised release and fine the Court may impose.

    e.    Defendant and his attorney and the government acknowledge that the above guidelines calculations are preliminary in nature, and are non-binding predictions upon which neither party is entitled to rely. Defendant understands that further review of the facts or applicable legal principles may lead the government to conclude that different or additional guidelines provisions apply in this case. Defendant understands that the Probation Office will conduct its own investigation and that the Court ultimately determines the facts and law relevant to sentencing, and that the Court's determinations govern the final guideline calculation. Accordingly, the validity of this Agreement is not contingent upon the probation

officer's or the Court's concurrence with the above calculations, and defendant shall not have a right to withdraw his plea on the basis of the Court's rejection of these calculations.

11.     Both parties expressly acknowledge that this Agreement is not governed by Fed. R. Crim. P. 11(c)(1)(B), and that errors in applying or interpreting any of the sentencing guidelines may be corrected by either party prior to sentencing. The parties may correct these errors either by stipulation or by a statement to the Probation Office or the Court, setting forth the disagreement regarding the applicable provisions of the guidelines. The validity of this Agreement will not be affected by such corrections, and defendant shall not have a right to withdraw his plea, nor the government the right to vacate this Agreement, on the basis of such corrections.

### Agreements Relating to Sentencing

12.     Each party is free to recommend whatever sentence it deems appropriate.

13.     It is understood by the parties that the sentencing judge is neither a party to nor bound by this Agreement and may impose a sentence up to the maximum penalties as set forth above. Defendant further acknowledges that if the Court does not accept the sentencing recommendation of the parties, defendant will have no right to withdraw his guilty plea.

15

14.     Defendant agrees to pay the special assessment of $200 at the time of sentencing with a cashier's check or money order payable to the Clerk of the U.S. District Court.

15.     After sentence has been imposed on the counts to which defendant pleads guilty as agreed herein, the government will move to dismiss the remaining counts of the indictment as to defendant.

## Acknowledgments and Waivers Regarding Plea of Guilty

### Nature of Agreement

16.     This Agreement is entirely voluntary and represents the entire agreement between the United States Attorney and defendant regarding defendant's criminal liability in case 18 CR 465.

17.     This Agreement concerns criminal liability only. Except as expressly set forth in this Agreement, nothing herein shall constitute a limitation, waiver, or release by the United States or any of its agencies of any administrative or judicial civil claim, demand, or cause of action it may have against defendant or any other person or entity. The obligations of this Agreement are limited to the United States Attorney's Office for the Northern District of Illinois and cannot bind any other federal, state, or local prosecuting, administrative, or regulatory authorities, except as expressly set forth in this Agreement.

18. After sentence has been imposed on the counts to which defendant pleads guilty as agreed herein, the government will move to dismiss the indictment in Case No. 18 CR 509 as to this defendant.

### Waiver of Rights

19. Defendant understands that by pleading guilty he surrenders certain rights, including the following:

a. **Trial rights**. Defendant has the right to persist in a plea of not guilty to the charges against him, and if he does, he would have the right to a public and speedy trial.

    i. The trial could be either a jury trial or a trial by the judge sitting without a jury. However, in order that the trial be conducted by the judge sitting without a jury, defendant, the government, and the judge all must agree that the trial be conducted by the judge without a jury.

    ii. If the trial is a jury trial, the jury would be composed of twelve citizens from the district, selected at random. Defendant and his attorney would participate in choosing the jury by requesting that the Court remove prospective jurors for cause where actual bias or other disqualification is shown, or by removing prospective jurors without cause by exercising peremptory challenges.

    iii. If the trial is a jury trial, the jury would be instructed that defendant is presumed innocent, that the government has the burden of proving defendant guilty beyond a reasonable doubt, and that the jury could not convict him

unless, after hearing all the evidence, it was persuaded of his guilt beyond a reasonable doubt and that it was to consider each count of the indictment separately. The jury would have to agree unanimously as to each count before it could return a verdict of guilty or not guilty as to that count.

iv.     If the trial is held by the judge without a jury, the judge would find the facts and determine, after hearing all the evidence, and considering each count separately, whether or not the judge was persuaded that the government had established defendant's guilt beyond a reasonable doubt.

v.     At a trial, whether by a jury or a judge, the government would be required to present its witnesses and other evidence against defendant. Defendant would be able to confront those government witnesses and his attorney would be able to cross-examine them.

vi.     At a trial, defendant could present witnesses and other evidence in his own behalf. If the witnesses for defendant would not appear voluntarily, he could require their attendance through the subpoena power of the Court. A defendant is not required to present any evidence.

vii.     At a trial, defendant would have a privilege against self-incrimination so that he could decline to testify, and no inference of guilt could be drawn from his refusal to testify. If defendant desired to do so, he could testify in his own behalf.

18

b. **Appellate rights.** Defendant further understands he is waiving all appellate issues that might have been available if he had exercised his right to trial, and may only appeal the validity of this plea of guilty and the sentence imposed. Defendant understands that any appeal must be filed within 14 calendar days of the entry of the judgment of conviction.

20. Defendant understands that by pleading guilty he is waiving all the rights set forth in the prior paragraphs, with the exception of the appellate rights specifically preserved above. Defendant's attorney has explained those rights to him, and the consequences of his waiver of those rights.

### Presentence Investigation Report/Post-Sentence Supervision

21. Defendant understands that the United States Attorney's Office in its submission to the Probation Office as part of the Pre-Sentence Report and at sentencing shall fully apprise the District Court and the Probation Office of the nature, scope, and extent of defendant's conduct regarding the charges against him, and related matters. The government will make known all matters in aggravation and mitigation relevant to sentencing.

22. Defendant agrees to truthfully and completely execute a Financial Statement (with supporting documentation) prior to sentencing, to be provided to and shared among the Court, the Probation Office, and the United States Attorney's Office regarding all details of his financial circumstances, including his recent income tax returns as specified by the probation officer. Defendant understands that

19

providing false or incomplete information, or refusing to provide this information, may be used as a basis for denial of a reduction for acceptance of responsibility pursuant to Guideline § 3E1.1 and enhancement of his sentence for obstruction of justice under Guideline § 3C1.1, and may be prosecuted as a violation of Title 18, United States Code, Section 1001 or as a contempt of the Court.

23.    For the purpose of monitoring defendant's compliance with his obligations to pay a fine during any term of supervised release or probation to which defendant is sentenced, defendant further consents to the disclosure by the IRS to the Probation Office and the United States Attorney's Office of defendant's individual income tax returns (together with extensions, correspondence, and other tax information) filed subsequent to defendant's sentencing, to and including the final year of any period of supervised release or probation to which defendant is sentenced. Defendant also agrees that a certified copy of this Agreement shall be sufficient evidence of defendant's request to the IRS to disclose the returns and return information, as provided for in Title 26, United States Code, Section 6103(b).

### Other Terms

24.    Defendant agrees to cooperate with the United States Attorney's Office in collecting any unpaid fine for which defendant is liable, including providing financial statements and supporting records as requested by the United States Attorney's Office.

20

25.    Defendant understands that, if convicted, a defendant who is not a United States citizen may be removed from the United States, denied citizenship, and denied admission to the United States in the future.

### Conclusion

26.    Defendant understands that this Agreement will be filed with the Court, will become a matter of public record, and may be disclosed to any person.

27.    Defendant understands that his compliance with each part of this Agreement extends throughout the period of his sentence, and failure to abide by any term of the Agreement is a violation of the Agreement. Defendant further understands that in the event he violates this Agreement, the government, at its option, may move to vacate the Agreement, rendering it null and void, and thereafter prosecute defendant not subject to any of the limits set forth in this Agreement, or may move to resentence defendant or require defendant's specific performance of this Agreement. Defendant understands and agrees that in the event that the Court permits defendant to withdraw from this Agreement, or defendant breaches any of its terms and the government elects to void the Agreement and prosecute defendant, any prosecutions that are not time-barred by the applicable statute of limitations on the date of the signing of this Agreement may be commenced against defendant in accordance with this paragraph, notwithstanding the expiration of the statute of limitations between the signing of this Agreement and the commencement of such prosecutions.

21

28.   Should the judge refuse to accept defendant's plea of guilty, this Agreement shall become null and void and neither party will be bound to it.

29.   Defendant and his attorney acknowledge that no threats, promises, or representations have been made, nor agreements reached, other than those set forth in this Agreement, to cause defendant to plead guilty.

30.   Defendant acknowledges that he has read this Agreement and carefully reviewed each provision with his attorney. Defendant further acknowledges that he understands and voluntarily accepts each and every term and condition of this Agreement.

AGREED THIS DATE: _____4-18-19_____

JOHN R. LAUSCH, JR.
United States Attorney

TIRSO MONTES
Defendant

MATTHEW L. KUTCHER
Assistant U.S. Attorney

PIYUSH CHANDRA
Attorney for Defendant

22

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | No. 18 CR 465-2 |
| v. | Honorable Matthew F. Kennelly |
| TIRSO MONTES | |

**GOVERNMENT'S POSITION PAPER AS TO SENTENCING FACTORS**

The United States of America, through JOHN R. LAUSCH, JR., United States Attorney for the Northern District of Illinois, submits its sentencing memorandum as to defendant Tirso Montes. For the reasons set forth in more detail below, the government requests that the Court impose a sentence within the advisory Guidelines range of 92 to 115 months' imprisonment and a three-year term of supervised release. Defendant's conduct in this case – participating in the making of extortionate calls – and his criminal history and background, all demonstrate that a Guidelines sentence is sufficient and not more than necessary to satisfy the goals of criminal sentencing.

## I.    BACKGROUND AND OFFENSE CONDUCT

As set forth in his plea agreement, defendant has pleaded guilty to making, transmitting, or causing to be transmitted extortionate calls that contained a demand for ransom for the release of Individual A, in violation of Title 18, United States Code, Sections 875(a) and 2. Defendant has also stipulated to possessing a firearm by a convicted felon, in violation of Title 18, United States Code, Section 922(g)(1).

## A. Extortion

In the early morning hours of October 30, 2017, Individual B reported to law enforcement that his nephew, Individual A, called him and said that he had been kidnapped, and that the kidnappers sought $100,000 or two kilograms of cocaine as ransom. The calls made to Individual B were initially made from Individual A's phone number. Later calls appeared as coming from a "private number" such that Individual B could not determine the telephone number or numbers calling his phone. Telephone records, including cell site information, call detail records, and location information for Individual B and Individual A's phones confirmed that Individual A's phone was used to contact Individual B with that initial extortionate demand at approximately 8:09 a.m., and calls from co-defendant Jorge Rosario's phone to Individual B (which were disguised as coming from a "private number") began at 8:33 a.m.

Throughout the day on October 30, 2017, defendant participated with the other defendants in making or causing to be made numerous calls to Individual B, during which one or more of the defendants threatened to harm Individual A if ransom was not paid. Those calls were disguised by the caller dialing 67 before Individual B's number was dialed. In addition, all of the defendants communicated with each other, in person and by telephone, regarding the extortion throughout the day.

2

The calls to Individual B[1] and the communications between defendants included the following:

- At approximately 10:12 a.m., Individual B received a call from Rosario's phone. Individual B told the caller that he was waiting on his brother. The caller told Individual B not to "play games" and Individual B assured him he isn't paying games and that he was "going to make it happen." Individual A then speaks and tells Individual B that "they" were going to kill him. Individual B reassured Individual A that he was getting the money soon. Another co-defendant, whose voice is not recognizable, then told Individual B that Individual B should not call the police and that "your nephew good." Individual B was told he would get a call back.

- At approximately 10:22 a.m., Individual B received a call from Rosario's phone. During that call, the caller asked "Where you at? You at the police station or something?" Individual B told the caller that he was at his brother's workplace, a Coca Cola factory. The caller asked how long they had to wait. Rosario can then be heard saying that it was taking too long.

- At approximately 10:44 a.m., Individual B received a call from Rosario's phone. During that call, Rosario told Individual B that Individual A called another person, Individual C, but that person did not care about Individual A. Rosario said, "He in this jam because of [Individual C], it ain't cause of you."

- At approximately 10:55 a.m., Individual B received a call from Rosario's phone. During that call, Individual B told Rosario that he could only get "44Gs." Rosario responded, "that's all you got right now?" Individual B said that he could also get some cocaine to add to the $44,000. Rosario said, "put the 44 and put the rest to work, and come on come and get him. I'm gonna call you in 5 minutes and tell you where to meet me at." Individual B said that it would take some time to get the cocaine, and Rosario responded, "grab it fast though, grab it as fast as possible, meet me somewhere in K-town area, I'm somewhere in K-Town right now."

---

[1] The government has provided the Court with a DVD containing the recorded calls made to Individual B's phone on October 30, 2017, as an attachment to the courtesy copy of the Government's Position Paper as to Sentencing Factor as to defendant Jorge Rosario.

- At approximately 11:14 a.m., Rosario sent a text message to co-defendant Angelo Quinones, which stated, "Hurry bitch we gotta pick up the money."

- At approximately 11:24 a.m., Individual B received a call from Rosario's phone. During that call, Individual B told Rosario that he had picked up the cocaine, but needed to know where to go with it. Rosario said to stay in K-Town, that he would meet Individual B in the area, and that Individual B should wait for another call in 10 minutes.

- At approximately 11:39 a.m., Individual B received a call from Rosario's phone. During that call, Individual B told Rosario that he was on his way toward K-Town. Rosario told Individual B to get whatever cocaine he had and to meet him in K-Town in 10 minutes. Rosario then put Individual A on the phone. Individual A told Individual B to do this as fast as he could. Individual B then asked how they were going to handle the exchange because Individual B did not want to show up and not get his nephew. Rosario then said, "He's good" and "we gonna let him go."

- At approximately 11:56 a.m., Individual B received a call from Rosario's phone. During that call, Individual B told the caller that he was waiting for "his guy" to go with him because Individual B did not know the callers and did not want to end up in the same situation as his nephew. Rosario then said, "Your nephew, he knows what's up, you give up, you give that shit up and he's good." Individual B said that he was waiting for his ride and Rosario said, "No Police" and "We streets, we streets with this shit."

- At approximately 12:13 p.m., co-defendant Tirso Montes texted Rosario, stating "Wats taking so long." Rosario responded "D we waiting on him ima call em in 10 mins tell him were to meet me pw". Montes responded that it was taking too long and they needed to leave. Rosario responded "We is we good pw nobody lives down stairs."

- At approximately 12:18 p.m., Individual B received a call from Rosario's phone. During that call, Individual B asked where he needed to go. The caller asked where Individual B was and Individual B replied that he was at Armitage and Pulaski. The caller told Individual B to go to the Humboldt Park area of Chicago and he would call Individual B in five minutes.

- At approximately 12:27 p.m., Individual B received a call from Rosario's phone. During that call, Individual B asked where he needed to go. The caller asked what type of car Individual B was driving. Individual B told

4

him he was driving a Cadillac truck. The caller told Individual B to put "everything, all in one bag." Individual B then asked how he was going to get his nephew. The caller said his nephew was "good." The caller said his nephew was "in the crib" and was "good." The caller said Individual B needed to have a little "trust" and that he would send his nephew after they receive the money. Individual B said he didn't want to give them his money and then they "smoke" his nephew. The caller said he wasn't going to "smoke" his nephew. Individual B said "I know how this goes, I'm Mexican, we kidnap motherfuckers too." The callers then agreed to let Individual B speak to his nephew in another call.

- At approximately 12:32 p.m., Individual B received a call from co-defendant Thomas Lee's phone, during which call Individual B spoke with Individual A and another caller, possibly Lee. Individual A told Individual B that Individual B needed to "take the chance, man." Individual B asked why he should take a chance and then they would "smoke" Individual A. One of the callers told Individual B, "he safe right here, we ain't put no hands on him, we just want that money." The caller said, "we don't want no police." Individual B said he wasn't working with the police and that he had kidnapped people before, "I know how this go." Individual A told Individual B, "they not gonna hurt me." The caller said, "Listen, listen, listen, once your nephew's gone my nigga I'll give up his phone back so he can call you, so you can come and pick him…wherever you want to meet at." Individual B said he would talk to his "guy" and they should call him back.

- At approximately 12:38 p.m., Individual B received a call from Rosario's phone. Individual B told the caller that he was waiting for approval from the family to give over the money. The caller asked if Individual B was calling the police. Individual B said he was not calling the police. Individual B told the caller, "I got this paper…you gonna get paid." The caller said, "Once we get paid, he gets let loose. You know how this shit goes." Individual B said, "I've gotten money and haven't let motherfuckers loose." The callers can be heard talking about putting Individual A in the car and taking Individual A to Individual B. The caller says, "the streets say you the police." Individual B said, "you want this money, I got it."

- At approximately 12:44 p.m., Individual B received a call from co-defendant Lee's phone. Individual A said, "Please please." The caller then took the phone and stated, "Listen to me real quick, I only got two options right now, either I get the money or…" At that point, the callers became inaudible.

5

- At approximately 12:47 p.m., Individual B received a call from co-defendant Lee's phone. During the call, Individual A told Individual B that they were going to drop him five blocks away, "they already untied me, they charged my phone, they just want the money and [Individual C], that's it. … I'm untied." When Individual B said he couldn't just release the money, Individual A said, "then they are going to kill me … they already tried to cut my finger."

- At approximately 12:56 p.m., Individual B received a call from Rosario's phone. During the call, Rosario told Individual B, "Get the money together, you gonna jump in with us, once you jump in with us, we gonna take you to Juju [Individual A]." Rosario went on to say, "I'mma meet you somewhere, you gonna put the money in one car, we gonna let, you gonna be on the phone with Juju, Juju, I'm bringing him out the crib right now, they bringing him out the crib right now…. When we do the deal, he gonna be there, everything's gonna be good." Individual B and the caller agreed to meet at a taco place at Chicago and Grand in Chicago.

- At approximately 1:26 p.m., defendant texted Rosario, asking what the plan was. Rosario responded, "This nikka phone off make him call the Mexican who owns the restaurant." Montes replied that the phone was off. Rosario responded, "Tell em who he gone call or we gone turn em in to black D for a brick."

- At approximately 1:28 p.m., defendant sent Rosario a text message, saying that he was about to let Individual A go and Rosario responded, "We aint do all this for nothing we gone get something."

- At approximately 1:46 p.m., Individual B received a call from Lee's phone. During the call, the caller asked Individual B what happened and Individual B explained that his cell phone died and he needed to charge it. The caller stated, "we got your nephew," that they are tired of driving around and want to meet. The caller said, "You need what we have." The callers then said that he was going to call Individual A's mother so she could hear his voice.

- At approximately 1:55 p.m., Rosario sent defendant a text message, saying, "talked to buddy in Mexico he knw Wat it is, he said they gone pay."

- At approximately 2:52 p.m., Quinones sent a text message to Lee that stated, "Stop saying names."

6

- At approximately 3:32 p.m., defendant texted Rosario, "D jump in here so I could close my eyes for a few."

- At approximately 4:19 p.m., a phone number assigned to "Ashley" texted Rosario, "Yu gud." Rosario responded, "I want tjis money so I cud get put up n sleep all day."

- At approximately 5:40 p.m., Individual B received a call from Lee's phone. During the call, Individual B told Individual A that Individual A's mother was taken to a hospital. Individual B said he was getting back on the road. The caller said he would call back to instruct Individual B where to meet.

- At approximately 6:14 p.m., Individual B received a call from Lee's phone. During the call, Rosario can be heard telling Individual B to "Just come down North Avenue" and that they will call back in 20 minutes. A male voice can be heard in the background yelling, "Quit playing games Shorty."

- At 6:26 p.m., Rosario texted a number assigned to "Jenny Ramos," stating "Sopoably he on his way with the money." Ramos responded, "Finally! Hopefully ain't no bullshit. PLEASE BE CAREFUL BABE." Ramos went on, "Be ready for anything my love, you never know."

Based on phone location information received from the service providers pursuant to Court orders, agents were able to determine where the phones making the calls were located. Law enforcement officers and agents conducted a rescue operation at that address at approximately 6:40 p.m. During the rescue operation, law enforcement conducted air surveillance and officers observed that during the rescue, a firearm was thrown from a second floor bedroom onto a roof next door. The firearm was later recovered and determined to be a Glock 21 Gen 4 .45 caliber

handgun with serial number YUW134. The firearm was loaded with 12 live .45 caliber rounds.[2]

When they entered the second floor apartment of the residence, officers and agents found Individual A and Quinones in the living room and both were placed into custody. Agents then observed Rosario exiting a bedroom adjacent to the living room and Rosario was placed into custody. The bedroom was observed to have a northbound facing window with no screen. This window was later determined to be the same window from which air surveillance had observed the firearm being thrown during the rescue operation. Agents also found Lee and defendant in a second bedroom adjacent to the living room. Lee and Montes were placed into custody. A photograph showing defendant holding a firearm toward Individual A was later found on co-defendant Lee's cell phone.

## B.    Possession of a Firearm by a Convicted Felon

Defendant has also stipulated to previously having been convicted of a crime punishable by a term of imprisonment exceeding one year and knowingly possessing in and affecting interstate commerce a firearm, namely, a Savage Arms Inc., model Mark II, .22LR caliber bolt-action rifle, bearing serial number 2308370; a Savage Arms Inc., model 12, .308 Winchester caliber bolt-action rifle, bearing serial number H027849; and a Sturm, Ruger and Co., model 10/22, .22 LR caliber semiautomatic

---

[2] The government has provided the Court with the video of the air surveillance as an attachment to the courtesy copy of the Government's Position Paper as to Sentencing Factor as to defendant Jorge Rosario.

rifle, bearing serial number 355-02090, which firearms had traveled in interstate and foreign commerce prior to defendant's possession of the firearms, in violation of Title 18, United States Code, Section 922(g)(1).

Specifically, on January 25, 2018, months after the committing the extortion offense in October 2017, defendant agreed to sell three rifles in his possession for $1300 to a customer of Justin Acevedo (a co-defendant in 18 CR 509). Defendant understood that Acevedo was brokering the sale to this customer. Unbeknownst to defendant and to Acevedo, the customer was a confidential source ("CS") who was working with undercover law enforcement officers ("UCs"). Defendant agreed to meet with the CS and the UCs so they could inspect the rifles prior to the sale.

That same day, at approximately 4:38 p.m., defendant received a call from Acevedo who told defendant that he had the money to purchase the firearms. During the course of subsequent calls, defendant and Acevedo arranged to meet at a Home Depot parking lot, located at 1919 North Cicero Avenue, in Chicago, Illinois.

At approximately 5:54 p.m., Acevedo and the CS arrived at the Home Depot parking lot and approached defendant. Defendant asked if the CS was police. Shortly afterwards, the UCs arrived, and defendant approached the UC vehicle and said that he wanted to move to a nearby Walmart parking lot.

At approximately 6:01 p.m., defendant, Acevedo, the CS, and the UCs a drove from the Home Depot parking lot to a Walmart parking lot located at 4650 West North Avenue, in Chicago, Illinois. When they arrived, defendant, Acevedo, the CS,

and the UCs all exited their respective cars and walked to the rear of the UC vehicle. Defendant asked a UC, "y'all ain't the police, is y'all?" Defendant then retrieved two long gun cases from the back seat of his Honda CRV and placed them in the back of the UC vehicle. Defendant knew that the following were in the gun cases: a Savage Arms, Mark II .22 caliber rifle bearing serial number 2308370; a Ruger, model 10/22, .22 caliber rifle bearing serial number 355-02090; a Savage Arms, model 12, 308 caliber rifle bearing serial number H927849; two black suppressors; one black Osprey 10-40x50 scope; a black trigger mechanism; and a .22 caliber extended magazine.

Defendant also knew that Acevedo then sold the UCs the rifles. Shortly afterwards, Acevedo returned to defendant's car and gave him $1,300, which defendant understood to be his proceeds from the sale. Defendant then retrieved several boxes of assorted ammunition, including approximately 1,500 .22 caliber rounds of Remington ammunition; approximately 400 .22 caliber rounds of Speer ammunition; and approximately 240 7.62 caliber rounds of ammunition from the rear backseat of the Honda CRV and placed the boxes of ammunition in the UC vehicle.

Two of the firearms sold to the UCs in the January 25, 2018 sale were stolen: the Savage Arms, Mark II .22 caliber rifle bearing serial number 2308370 and the Savage Arms, model 12, 308 caliber rifle bearing serial number H927849. In addition, prior to his possession of the firearms on January 25, 2018, defendant knew that he had been convicted of a crime punishable by a term of imprisonment exceeding one

year, as he served a six-year sentence in the Illinois Department of Corrections (IDOC) for a 2004 conviction.

## II. GUIDELINE CALCULATIONS

The government does not have any objections to the Presentence Investigation Report ("PSR"). The government agrees that the total offense level after acceptance of responsibility is 26. Based on that offense level and a criminal history category of IV, the appropriate Guidelines range is 92 to 115 months' imprisonment and a term of supervised release of one to three years.

## III. THE FACTORS SET FORTH IN 18 USC § 3553(a) WARRANT A SENTENCE WITHIN THE GUIDELINES RANGE

The advisory Guidelines range is the starting point and initial benchmark for determining the appropriate sentence for defendant. *United States v. McLaughlin*, 760 F.3d 699, 708 (7th Cir. 2014). Although a sentence within the Guidelines range is presumptively reasonable, *United States v. Cano-Rodriguez*, 552 F.3d 637, 639 (7th Cir. 2009), the court must consider the factors set forth in 18 U.S.C. § 3553(a) in determining an appropriate sentence. Further, sentences within the advisory Guidelines range help avoid unwarranted sentencing disparities. *See United States v. Reyes-Medina*, 683 F.3d 837, 841 (7th Cir. 2012) (a sentence within the advisory guidelines range necessarily complies with 18 U.S.C. § 3553(a)(6)); *see also United States v. Orsburn*, 525 F.3d 543, 547 (7th Cir. 2008) (courts avoid sentencing disparities by starting with the advisory guidelines range and making adjustments at the margin). In this case a sentence within the advisory Guidelines range is

11

sufficient, but not greater than necessary, to reflect the seriousness of defendant's offense, promote respect for the law, provide just punishment for defendant's crime, and afford adequate deterrence.

### C.    The Nature and Circumstances of the Offenses

The nature and circumstances of the offenses support a sentence within the appropriately calculated Guidelines range. First, defendant participated in a scheme of extortion of Individual A's uncle, Individual B, seeking $100,000 of ransom (in cash or cocaine) in exchange for the release of Individual A.  The numbers from which those calls were made were intentionally blocked by the callers in order to thwart law enforcement. Nevertheless, Individual B took those calls seriously, and alerted law enforcement. Law enforcement responded appropriately, launching a full-scale investigation involving agents of the Bureau of Alcohol, Tobacco, Firearms and Explosives, the Federal Bureau of Investigation and the Department of Homeland Security Investigations and Chicago Police Department officers. Those agents and officers worked throughout the day to locate defendant and his co-defendants, fearing that defendants would seriously harm or even kill Individual A.  When Individual A's mother learned of the extortionate demands, she suffered from anxiety and had to be rushed to the hospital.

Based on the photograph found on co-defendant Lee's cell phone, it is clear that defendant possessed a firearm during the time that the extortionate calls were being made.  Defendant's possession of a firearm, and the fact that that firearm was in the

residence when officers and agents conducted their rescue mission only adds to the increased danger posed by defendant's conduct.

Moreover, at the end of the day, the agents and officers prepared for and executed a rescue mission. That activity involved ATF, FBI, HSI, CPD and the Chicago Fire Department, and also included an air surveillance unit. Beyond the amount of resources that were expended conducting the rescue, the mission could have resulted in serious physical harm to the agents and officers, bystanders as well as to defendant, his co-defendants and to Individual A.

Given all of those circumstances related to the extortion offense – the nature of the calls, the scale of the operation to rescue the purported kidnapped victim, the impact on the purported victim's mother and the possession of the firearm during the commission of the offense – a sentence within the Guidelines range is both appropriate and necessary on that offense alone.

Second, defendant has not only admitted to the extortion that took place on October 30, 2017. In addition, defendant has also stipulated that he provided firearms – including two stolen firearms – to Justin Acevedo, who identified himself during the transactions as a member of a street gang. Defendant confirmed during one of the transactions with the CS that the CS was not "police" because he knew what he was doing was unlawful, and yet he did it anyway. Defendant was also told that the purchasers were "biker mother fuckers." Defendant's possession of the firearms by itself would have been illegal. But defendant did not simply possess the

13

firearms for his own collection or for his protection. Defendant sold and transferred the firearms to people he did not know; defendant did not know why those people wanted the firearms or what they planned to do with the firearms, nor did he seem to care. In a time in Chicago when gun violence is disturbingly common, defendant's actions are that much more serious. Accordingly, defendant's conduct in both offenses are sufficiently serious to merit a serious sentence, which is a term of imprisonment within the appropriately calculated Guidelines range.

### D.    History and Characteristics of the Defendant

Over the course of just a few months, defendant participated in two serious and dangerous offenses – extortion and the sale of firearms – which speaks volumes about his character.    Defendant's criminal history further demonstrates his character.  He was convicted in April 2004 for attempted first-degree murder of a police officer.  For that conviction, he received a sentence of six years imprisonment. In June 2016, four separate cases of burglary, where he was acting as a lookout for someone who had broken into a home.  In addition to those convictions, defendant was arrested 22 times as a juvenile and 10 times as an adult, including for domestic battery, criminal damage to property and multiple motor vehicle incidents.  That history is indicative of the defendant's inability to abide by the law and, even more troubling, puts other people at risk.

According to Probation, the death of his mother's fiancée appears to have caused defendant to "spiral downward" when he was nine years old, which led

14

defendant to a life as a member of the Maniac Latin Disciples. (PSR ¶¶ 111, 114.) His membership in the MLDs may also explain his involvement in this offense, and his prior criminal offenses arrests. (PSR ¶ 64.) That traumatic event, while mitigating, does not, however, outweigh defendant's conduct such that a below-Guidelines sentence would be appropriate here.

Defendant committed the conduct in these cases when he was 33 years old, which is old enough to know that he was putting himself, his co-defendants, Individual A and law enforcement, and the community in general, in serious danger. These were not the acts of a teenager or someone who was dealing with a recent trauma; rather, as his mother noted to Probation, defendant committed the extortion offense because he needed the money (PSR ¶ 114) and that also appears to have driven him to sell firearms to the UC. Because this offense, like the extortion offense, was so serious, and put so many people at risk, and because there are few mitigating circumstances in defendant's history and character that could mitigate these offenses, a Guidelines sentence is appropriate and necessary.

### E. Need for the Sentence Imposed to Reflect the Seriousness of the Offense, Promote Respect for the Law, and Provide Just Punishment as well as Adequate Deterrence

The need for defendant's sentence to reflect the seriousness of his offenses is critical here. A Guidelines sentence will address the seriousness of both offenses and promote respect for the law in that it will let defendant know that extortion and the possession and sale of firearms will not be tolerated and will be treated severely.

15

Moreover, a significant period of incarceration is necessary to deter defendant and others from committing similar crimes in the future and to protect the public.

## IV. GOVERNMENT'S POSITION ON SUPERVISED RELEASE

Consistent with Probation's recommendation, the government recommends that the Court impose a term of supervised release of three years. The government agrees with the proposed mandatory, discretionary, and special conditions of supervised release set forth in the PSR as facilitating probation's supervision and easing defendant back into the community.

## V. CONCLUSION

For the foregoing reasons, the government respectfully requests that this Court impose a custodial sentence within the Guidelines range and a three-year term of supervised release with conditions.

Respectfully submitted,

JOHN R. LAUSCH, JR.
United States Attorney

by:

/s/ Matthew L. Kutcher
MATTHEW L. KUTCHER
Assistant United States Attorney
219 South Dearborn Street, Fifth Floor
Chicago, Illinois 60604
(312) 469-6132

16



UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

**FILED**

AUG 12 2019

JUDGE MATTHEW F. KENNELLY
UNITED STATES DISTRICT COURT

UNITED STATES OF AMERICA

  vs.

TIRSO MONTES

No. 18 CR 465

Judge Matthew F. Kennelly

## **PLEA ADDENDUM**

1. This Plea Addendum between the United States Attorney for the Northern District of Illinois, JOHN R. LAUSCH, JR., and defendant TIRSO MONTES, and his attorney, PIYUSH CHANDRA, amends the Plea Agreement entered between the parties on April 18, 2019, in case number 18 CR 465, as more fully set forth below.

2. The parties to this Plea Addendum have agreed upon the following amendment to paragraph 7 of the Plea Agreement, in addition to the language set forth therein:

> At the time that the defendant possessed the firearms, he knew that he was a convicted felon and that he had been previously convicted of a crime punishable by a term of imprisonment in excess of one year.

3. Defendant understands that this Plea Addendum will be filed with the Court, will become a matter of public record, and may be disclosed to any person.

4. Defendant and his attorney acknowledge that no threats, promises, or representations have been made, nor agreements reached, other than those set forth in this Plea Addendum, to cause defendant to plead guilty or to enter this Plea Addendum.

5.     Defendant acknowledges that he has read this Plea Addendum and carefully reviewed each provision with his attorney. Defendant further acknowledges that he understands and voluntarily accepts each and every term and condition of this Plea Addendum.

6.     Defendant has consulted with counsel about a change in law that requires the government to prove beyond a reasonable doubt that he knew of his status as a convicted felon on the date that he possessed the firearms, and after consultation with counsel, waives his right to withdraw his plea on record with respect to the stipulated offense of defendant's January 25, 2018 possession of a firearm, in violation of Title 18, United States Code, Section 922(g)(1).


AGREED THIS DATE: _August 12, 2019_


JOHN R. LAUSCH, JR.
United States Attorney

TIRSO MONTES
Defendant

MATTHEW L. KUTCHER
Assistant U.S. Attorney

PIYUSH CHANDRA
Attorney for Defendant

# EXHIBIT C

Report from Dr. Michael Gelbort filed separately under seal